CASE NO. 23-13031-E

IN THE UNITED STATES DISTRICT COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

L. SQUARED INDUSTRIES, INC.,

*Plaintiff-Appellant*,

V.

NAUTILUS INSURANCE COMPANY,

*Defendant-Appellee.*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

NO. 3:21-CV-01104-BJD-PDB

APPELLANT'S OPENING BRIEF

George W. Hatch, III, Esq.
Florida Bar No.: 0072028
george@guildaylaw.com

Dwight O. Slater, Esq.
Florida Bar No.: 0030607
dwight@guildaylaw.com

Robert D. Fingar, Esq.
Florida Bar No.: 0578282
bob@guildaylaw.com

Elizabeth M. van den Berg
Florida Bar No.: 0087744
elizabeth@guildaylaw.com

*Guilday Law, P.A.*
*1983 Centre Pointe Blvd., S-200*
*Tallahassee, Florida 32308*
*P: (850) 224-7091*
*F: (850) 222-2593*

*Counsel for Plaintiff-Appellant*

**L. Squared Industries, Inc. v. Nautilus Ins. Co. • No. 23-13031-E**

CERTIFICATE OF INTEREST PERSONS & CORPORATE DISCLOSURE
STATEMENT

The undersigned attorney certifies, pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1-2, that the following persons and entities may have an interest in the outcome of this case:

- Davis, Hon. Brian J. (*Trial Judge*)

- L. Squared Industries, Inc. (*Plaintiff-Appellant*)

- Maley, Robert (*50% Owner of Plaintiff-Appellant*)

- Maley, Felicity (*50% Owner of Plaintiff-Appellant*)

- Guilday Law, P.A. (*Counsel for Plaintiff-Appellant*)

- Fingar, Robert D. (*Counsel for Plaintiff-Appellant*)

- Hatch, III, George W. (*Counsel for Plaintiff-Appellant*)

- Slater, Dwight O. (*Counsel for Plaintiff-Appellant*)

- van den Berg, Elizabeth (*Counsel for Plaintiff-Appellant*)

- Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A. (*Counsel for Plaintiff-Appellant*)

- Ullo, Jr., F. Joseph (*Counsel for Plaintiff-Appellant*)

- O'Keefe, Kelly (*Counsel for Plaintiff-Appellant*)

- Nautilus Insurance Company (*Defendant-Appellee*)

- Clyde & Co US, LLP (*Counsel for Defendant-Appellee*)

- Bahadoran, Sina (*Counsel for Defendant-Appellee*)

- Warren, Aaron (*Counsel for Defendant-Appellee*)

Plaintiff-Appellant, L. Squared Industries, Inc., is not a subsidiary or affiliate of a publicly-owned corporation. Defendant-Appellee, Nautilus Insurance Co., is a wholly-owned subsidiary of Admiral Insurance Com., which is a wholly-owned subsidiary of J/I Holding Corp., which is a wholly-owned subsidiary of W.R. Berkley Corp. Berkley is a publicly held company.

Respectfully submitted,

By: /s/ [*Dwight O. Slater*]
George W. Hatch, III, B.C.S. • FBN 0072028
george@guildaylaw.com
Robert D. Fingar, Esq. • FBN 0578282
bob@guildaylaw.com
Dwight O. Slater, B.C.S. • FBN 0030607
dwight@guildaylaw.com
Elizabeth M. van den Berg • FBN 0087744
elizabeth@guildaylaw.com
**GUILDAY LAW, P.A.**
1983 Centre Pointe Blvd., S-200
Tallahassee, Florida 32308
P: (850) 224-7091
F: (850) 222-2593

*Counsel for Plaintiff-Appellant*

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellant respectfully requests an opportunity to present oral argument on the issues presented in this appeal. This case involves the interpretation of an intricate insurance contract and application to a unique set of facts. Plaintiff-Appellant believes that oral argument would aid this Honorable Court in its review.

# Table of Contents

Certificate of Interest Persons & Corporate Disclosure Statement ... 1

Statement Regarding Oral Argument ................................................. i

Table of Contents ............................................................................ ii

Table of Citations .......................................................................... iv

Jurisdictional Statement ............................................................... vii

Statement of the Issues(s) ............................................................viii

Statement of the Case & Facts ....................................................... 1

Summary of the Argument ............................................................ 26

Standard of Review........................................................................ 29

Argument ...................................................................................... 30

I.      The District Court erred in granting summary judgment for Nautilus and denying summary judgment for L. Squared; therefore, this Court should reverse the Final Judgment. ................................................. 30

        A.    The District Court misconstrued the Policy. .................. 33

              1.    The District Court's interpretation of "first discovered" does not comport with the term's plain and ordinary meaning......................... 34

              2.    Within the context of the Policy, the plain and ordinary meaning of the phrase "first discovered" means when, after investigation and confirmation, L. Squared learned that the pollution conditions were the result of a new discharge. ....................................... 35

3.  L. Squared first discovered and timely reported the pollution condition in April 2019 once its source was confirmed to be a new discharge from a covered storage tank system. ................................................................. 38

B.  At a minimum, the phrase "first discovered" as used in the Policy is ambiguous and any ambiguity should have been resolved in favor of L. Squared and providing coverage. ............................... 40

C.  The District Court erred in finding that a failure the notify Nautilus of the pollution condition within seven (7) days resulted in the denial of coverage. ....................................................................... 42

D.  Several of the District Court's findings are clearly erroneous or involve genuinely disputed material facts. ............................................................. 45

Conclusion ................................................................................. 53

Certificate of Compliance ............................................................ 54

## TABLE OF CITATIONS

**Cases**

*Am. Cas. Co. v. Etowah Bank,*
   288 F. 3d 1282 (11th Cir. 2002) ..........................................................29

*Auto-Owners Ins. Co. v. Anderson,*
   756 So. 2d 29 (Fla. 2000) ................................................ 33, 40, 41, 45

*Cagle v. Bruner,*
   112 F. 3d 1510 (11th Cir. 1997) ..........................................................29

*Carithers v. Mid-Continent Cas. Co.,*
   782 F. 3d 1240 (11th Cir. 2015) ..........................................................29

*Clena Invs., Inc. v. XL Specialty Ins. Co.,*
   No. 10–cv–62028, 2012 WL 1004851 (S.D. Fla. Mar. 26, 2012)............. 42, 43

*Coleman v. Fla. Ins. Guar. Ass'n,*
   517 So. 2d 686 (Fla. 1988) ..................................................................29

*Excelsior Ins. Co. v. Pomona Park Bar & Package Store,*
   369 So. 2d 938 (Fla. 1979) ...................................................... 33, 40, 41

*Graber v. Clarendon Nat'l Ins. Co.,*
   819 So. 2d 840 (Fla. Dist. Ct. App. 2002) .........................................29

*Herring v. First S. Ins. Co.,*
   522 So. 2d 1066 (Fla. 1st DCA 1988) ................................................41

*Ideal Mut. Ins. Co. v. C.D.I. Constr., Inc.,*
   640 F. 2d 654 (5th Cir. 1981) ............................................................41

*Ideal Mut. Ins. Co. v. Waldrep,*
   400 So. 2d 782 (Fla. 3d DCA 1981) ..................................................42

*Levinson v. Reliance Stand. Life Ins. Co.,*
   245 F. 3d 1321 (11th Cir. 2001) ..........................................................29

*Mich. Millers Mut. Ins. Corp. v. Benfield,*
140 F. 3d 915 24 (11th Cir. 1998) ..................................................30

*Mid–Continent Cas. Co. v. Basdeo,*
742 F. Supp. 2d 1293 (S.D. Fla. 2010) ..................................... 43, 44

*Mount Vernon Fire Ins. Co. v. Editorial Am., S.A.,*
374 So. 2d 1072 (Fla. 3d DCA1979) ..............................................43

*State Farm Fire and Cas. Co. v. Steinberg,*
393 F. 3d 1226 (11th Cir. 2004) .....................................................33

Travelers Indem. Co. v. PCR Inc.,
889 So. 2d 779 (Fla. 2004) ..............................................................30

*U.S. v. U.S. Gypsum Co.,*
333 U.S. 364 (1948) .........................................................................45

## Statutes

§ 376.309(1), Fla Stat. .......................................................................3

28 U.S.C. § 1332 ...............................................................................vii

42 U.S.C. § 6691b(c)(6) ......................................................................2

42 U.S.C. § 6991b(c)(4) ......................................................................2

42 U.S.C. § 6991b(d) ...........................................................................3

## Rules

Fed. R. App. P. 32 ............................................................................54

Fed. R. Civ. P. (60)(a)(6) .................................................................vii

Fed. R. Civ. P. 59(e) ...................................................................vii, 25

Fed. R. Civ. P. 60(a)(6) ....................................................................25

**Regulations**

40 C.F.R. § 280.92 ...................................................................................3

40 C.F.R. § 280.97 ...................................................................................2

40 C.F.R. § 280.97(b)(1) ..........................................................................2

40 C.F.R. 280.52(a) ..................................................................................5

40 C.F.R. 280.52(b) ..................................................................................5

40 C.F.R. 280.97 ........................................................................... 31, 38, 41

40 C.F.R. Title 40, Part 280, Subpart H .................................................3

Ch. 62-780, Fla. Admin. Code .................................................................47

Fla. Admin. Code R. 62.761.600 .............................................................46

Fla. Admin. Code R. 62-761.430 .................................................. 8, 48, 50

Fla. Admin. Code R. 62-761.430(1)(a)(10) ...............................................8

Fla. Admin. Code R. 62-761.440 ............................................................10

Fla. Admin. Code R. 62-761.600 ............................................................46

## Jurisdictional Statement

Jurisdiction for this declaratory action was proper in the United States District Court for the Middle District of Florida under 28 U.S.C. § 1332 based on diversity because Plaintiff-Appellant and Defendant-Appellee are citizens of different states and the amount in controversy exceeds the sum or value of $75,000.00.

Jurisdiction is proper in this Court under 28 U.S.C. § 1291 because Plaintiff-Appellant appeals from a final judgment by a District Court in this Circuit. The District Court entered the Final Judgment on June 27, 2023. Plaintiff-Appellant filed a timely Motion for Reconsideration in accordance with Fed. R. Civ. P. 59(e) & (60)(a)(6). The District Court entered an order denying Plaintiff-Appellant's Motion for Reconsideration on August 29, 2023. Plaintiff-Appellant filed a Notice of Appeal to this Court on September 15, 2023.

## S<span>TATEMENT OF THE</span> I<span>SSUES(S)</span>

Whether the District Court misconstrued the insurance policy and, as a result, erred in granting the summary judgment motion filed by Defendant-Appellee, and denying the summary judgment motion filed by Plaintiff-Appellant.

## STATEMENT OF THE CASE & FACTS

This appeal arises from proceedings in the United States District Court for the Middle District of Florida in which Plaintiff-Appellant, L. Squared Industries, Inc. ("L. Squared") sued its insurer, Defendant-Appellee, Nautilus Insurance Company ("Nautilus"), seeking a declaration of its rights under its insurance policy following Nautilus' denial of coverage. (Doc. 1-2, pg. 5).[1] The parties filed cross motions for summary judgment and, on June 23, 2023, the District Court issued an order granting Nautilus' motion for summary judgment and denying L. Squared's. (Doc. 51; Doc. 57; Doc. 89). The District Court entered final summary judgment for Nautilus on June 27, 2023. (Doc. 90).

Thereafter, L. Squared moved for reconsideration of the order granting Nautilus' motion for summary judgment. (Doc. 93). On August 29, 2023, the District Court entered an order denying L. Squared's motion for reconsideration. (Doc. 101). On September 15, 2023, L. Squared filed a notice of appeal

---

[1] L. Squared initially filed suit in the Circuit Court of the Seventh Judicial Circuit, in and for St. Johns County, Florida; however, Nautilus removed the action to the United States District Court for the Middle District of Florida based on diversity jurisdiction.

to this Court seeking review of both the order granting summary judgment for Nautilus, and the order denying L. Squared's motion for reconsideration. (Doc. 102).

### The State & Federal Regulatory Scheme

Federal and state regulations require financial responsibility to cover accidental releases of petroleum from underground storage tanks. Specifically, in Subchapter IX of the Solid Waste Disposal Act, Congress directed the U.S. Environmental Protection Agency ("U.S. EPA") to enact regulations for taking corrective action (*i.e.*, cleanup) in response to a release from an underground petroleum storage tank, and for requiring evidence of financial responsibility for such corrective action as well as for compensating third parties for bodily injury and property damage caused by accidental releases. 42 U.S.C. §§ 6991b(c)(4) & (6).

In response, the U.S. EPA promulgated 40 C.F.R. § 280.97, which authorizes the use of insurance as one way of demonstrating financial responsibility. Insurance policies procured for this purpose must cover sudden and non-sudden accidental releases. 40 C.F.R. § 280.97(b)(1). Accidental release means any sudden or non-sudden release of petroleum arising from operating an underground storage tank that results in a need for corrective action

–2–

and/or compensation for bodily injury or property damage neither expected nor intended by the tank owner or operator. 40 C.F.R. § 280.92. *See also* 42 U.S.C. § 6991b(d). Florida law also requires financial responsibility for corrective action and third-party liability relating to discharges from underground storage tank systems. *See* § 376.309(1), Fla Stat. To implement this requirement, the Florida Department of Environmental Protection ("FDEP") has enacted rules incorporating 40 C.F.R. Title 40, Part 280, Subpart H, as cited above. *See* Fla. Admin. Code R. 62-761.420.

With respect to corrective action, the U.S. EPA promulgated the following rule identifying acceptable methods for confirming releases:

> **Sec. 280.52 Release investigation and confirmation steps.**
>
> Unless corrective action is initiated in accordance with subpart F, owners and operators must immediately investigate and confirm all suspected releases of regulated substances requiring reporting under § 280.50 within 7 days, or another reasonable time period specified by the implementing agency, using either the following steps or another procedure approved by the implementing agency:
>
> (a)    System test. Owners and operators must conduct tests (according to the requirements for tightness testing in §§ 280.43(c) and 280.44(b) or, as appropriate, secondary containment testing described in § 280.33(d)).

(1) The test must determine whether:

    (i) A leak exists in that portion of the tank that routinely contains product, or the attached delivery piping; or

    (ii) A breach of either wall of the secondary containment has occurred.

(2) If the system test confirms a leak into the interstice or a release, owners and operators must repair, replace, upgrade, or close the UST system. In addition, owners and operators must begin corrective action in accordance with subpart F of this part if the test results for the system, tank, or delivery piping indicate that a release exists.

(3) Further investigation is not required if the test results for the system, tank, and delivery piping do not indicate that a release exists and if environmental contamination is not the basis for suspecting a release.

(4) Owners and operators must conduct a site check as described in paragraph (b) of this section if the test results for the system, tank, and delivery piping do not indicate that a release exists but environmental contamination is the basis for suspecting a release.

(b) Site check. Owners and operators must measure for the presence of a release where contamination is most likely to be present at the UST site. In selecting sample types, sample locations,

and measurement methods, owners and operators must consider the nature of the stored substance, the type of initial alarm or cause for suspicion, the type of backfill, the depth of groundwater, and other factors appropriate for identifying the presence and source of the release.

(1)  If the test results for the excavation zone or the UST site indicate that a release has occurred, owners and operators must begin corrective action in accordance with subpart F of this part;

(2)  If the test results for the excavation zone or the UST site do not indicate that a release has occurred, further investigation is not required.

In short, there are three methods by which a release may be confirmed: (1) by a failed test of the UST system, tank, or delivery piping (40 C.F.R. 280.52(a)), *i.e.,* a "system tightness test"; (2) by test results of samples taken "where contamination is most likely to be present at the UST site" (40 C.F.R. 280.52(b)), *i.e,* a "site check";[2] or (3) by another method approved by the implementing agency. A site check is required even if the system tests "tight," if the presence of contamination is the reason that a discharge is suspected.

---

[2] Obviously, category (2) is problematic at a site with pre-existing contamination and additional scientific evaluation is necessary to determine whether an accidental release has occurred.

All methods of confirming a release require the responsible party to clean up the contamination once it is confirmed.

### Facts of this Case

**The Parties.** Plaintiff-Appellant, L. Squared Industries, Inc., is owned by a husband and wife team—Mr. Robert Maley, who left high school in the tenth grade, and Ms. Felicity Maley, who left college during her senior year. (Doc. 57-17, pg. 8, 11).

The Maleys purchased L. Squared in 1974 as part of their acquisition of their first gas station, an Exxon station in St. Augustine. (Doc. 57-17, pgs. 10–11). Mr. Maley handles business operations, while Ms. Maley handles the bookkeeping. (Doc. 57-17, pgs. 8–9). Over the years, L. Squared owned and operated a total of four gas stations—three in the St. Augustine area and one in Wildwood. (Doc. 57-17, pg. 8). However, during the time period at issue in this case, L. Squared owned only one gas station—an Exxon station in St. Augustine. (Doc. 57-17, pg. 8). Though L. Squared owns the Exxon station, Sameer Muhho rents the facility and is responsible for its actual operations. (Doc. 57-17, pg. 20).

Defendant-Appellee, Nautilus Insurance Company, was formed in 1985 and operates as an eligible surplus lines insurer in all states except Arizona, where the company is domiciled. (Doc. 55, pg. 1).

***The Exxon Gas Station***. The gas station at issue in this matter is the Exxon station located in St. Johns County at 2450 Highway 16, St. Augustine, Florida 32902. (Doc. 57-5, pg. 1). Exxon discovered a petroleum hydrocarbon discharge at the Station in September 1985 (the "1985 Discharge") long before the Maley's involvement with the facility. (Doc. 57-5, pg. 1). At that time, the State of Florida deemed the discharge eligible for the Florida Department of Environmental Protection's ("FDEP")[3] reimbursement program. (Doc. 57-5, pg. 1). Five years later, the discharge became eligible under the Early Detection Incentive ("EDI") Program, which funds the remediation of the discharge. (Doc. 57-5, pg. 1). In October 2006, the previous tank system was removed and was replaced by the tank in use today. (Doc. 57-18, pg. 1). It should be noted that the 1985 Discharge still has not been fully remediated.

---

[3] References to the Florida Department of Environmental Protection and the entities with which it contracts throughout the state, are both indicated as "FDEP" in this brief.

*E.g.*, (Doc. 57-18, pg. 6) ("Therefore, the September 18, 1985 discharge appears to have impacted the smear zone (just beneath the surface) within the current UST area, potentially contaminating the clean backfill installed in 2006."); (Doc. 49-21, pg. 1) ("However, program eligible contamination remains at the site.").

***FDEP Inspects & Orders Repairs & Testing.*** On May 23, 2017, FDEP conducted an annual inspection on and noted (1) a need for repair of several cracked boots; (2) a need for hydro-testing; and (3) stated specifically that there was "no indication of new release." (Doc. 57-6, pg. 3). That same day, the operator of the Site, Sameer Muhho, filed an Incident Notification Form ("INF") with FDEP noting the cracked boots. (Doc. 57-7).[4] Thereafter, L. Squared hired Guardian Fueling Technologies ("Guardian") to make the necessary repairs. (Doc. 57-8).

On August 25, 2017, Guardian removed and replaced the boot gaskets at each of the dispenser sumps and the two underground storage tank

---

[4] Florida Administrative Code Rule 62-761.430 requires owners or operators to file an INF when a visual inspection reveals damage to certain components of an underground storage tank system. *See* Fla. Admin. Code R. 62-761.430(1)(a)(10).

sumps. (Doc. 57-8). Guardian hired The NDN Companies Inc. ("NDN") to perform a site check and inspect the soil. (Doc. 57-8). On October 23, 2017, NDN submitted a Limited Closure Report to Guardian. (Doc. 57-8). In the report, NDN did not report that there was any new discharge at the facility, determined no further site assessment was necessary at the time, concluded that there were "hydrocarbon vapors and elevated concentrations of benzene and total xylenes in soil sample SB-4-2., but noted "the site is currently registered in the FDEP Petroleum Restoration Program [for the 1985 discharge] and is awaiting funding [by the FDEP] for further assessment." (Doc. 57-8, pg. 4). Importantly, NDN did not conclude that the elevated chemical concentrations in soil sample SB-4-2 were attributable to a new discharge. (Doc. 57-8). NDN also sent a copy of its report to FDEP. (Doc. 57-9, pg. 1).

The Environmental Quality Division ("EQD"), the local program with which FDEP contracts, reviewed NDN's Limited Closure Assessment Report, and on March 2, 2018, found that it did not comply with the closure assessment regulations for sampling and, as a result, directed additional sampling. (Doc. 57-9). Even though its instructions provide that the owner has the opportunity to determine whether contamination may be the result

of a previously reported discharge, EQD required L. Squared to file a Discharge Report Form ("DRF"). (Doc. 57-9; Doc. 57-10). L. Squared, of course, complied. (Doc. 57-10). A DRF is required any time there is a "confirmed discharge," any time visual observations or analytical tests (surface, groundwater, or soil) indicate the presence of contamination, or in the event of a spill or overfill of a regulated substance. (Doc. 57-10, pg. 1). *See also* Fla. Admin. Code R. 62-761.440.

On the DRF, L. Squared indicated that the "date of discovery" was July 2017; however, that date was not intended to indicate the "first discovery" of a "new discharge," but rather that analytical testing had revealed the existence of contamination, which NDN presumed was a product of the 1985 discharge as evidence by its conclusion that "[t]he site is currently registered in the FDEP Petroleum Restoration Program and is awaiting funding for further assessment." (Doc. 57-10; Doc. 57-8, pg. 8). Further, L. Squared also indicted on the form that the "Estimated number of gallons discharged: Unconfirmed site failed Hydro test." (Doc. 57-10, pg. 2). Nevertheless, L. Squared contended all along that the failed hydro test of the boots did not indicate a new discharge because the boots do not routinely contain product. (Doc. 57-22, pgs. 124:2-13; 126:3-12; 126:24-127:8).

On March 9, 2018, FDEP sent letter to L. Squared with additional comments on NDN's Limited Closure Assessment Report, stating that there was a need to complete the Closure Assessment by conducting additional groundwater testing; additional sampling of soil surrounding additional boots; and additional testing of the soil surrounding SB-4-2 to determine the extent of contamination. (Doc. 57-11, pgs. 1–2). Importantly, FDEP did not state that it had identified a new release at that time. (Doc. 57-11). On April 19, 2018, FDEP issued a Warning Letter concerning the facility requiring additional repairs and sampling. (Doc. 57-12, pg. 2; Doc. 57-13, pg. 1). L. Squared notified Nautilus about the Warning Letter in its application for insurance. (Doc. 57-3, pg. 12). On June 14, 2018, Guardian replaced a dispenser sump at dispenser 5/6. (Doc. 57-12, pg. 1).

Thereafter, L. Squared hired Taylor Environmental Consulting to conduct closure assessment activities in connection with the dispenser 5/6 dispenser sump replacement. (Doc. 57-12, pg. 1). Taylor Environmental inspected fuel dispenser 5/6 and rendered a Closure Assessment for Replacement of Dispenser Sump dated August 16, 2018, in which it did not find impacts at fuel dispenser 5/6. *See* (Doc. 57-12). However, the Closure Assessment did identify some groundwater contamination, but concluded that it

was either from the 1985 Discharge or the contamination L. Squared reported on March 8, 2018 in the DRF. (Doc. 57-12, pg. 4). While it was unclear as to the source of the contamination, Taylor Environmental's recommendation that the groundwater contamination be addressed as part of the government-funded assessment and cleanup of the 1985 Discharge suggested that it believed that, more likely than the not, the contamination resulted from the 1985 Discharge. (Doc. 57-12, pg. 4). The report also recommended additional sampling of groundwater and soil for the STP sump in the area of SB-4-2, which is approximately at the center of the current underground storage tank area. (Doc. 57-12, pg. 4).

Taylor Environmental submitted the report to FDEP; however, the assigned project manager never responded; she ultimately ended up leaving FDEP.[5] (Doc. 57-13, pg. 1). A successor project manager noticed that his predecessor had dropped the ball; accordingly, on April 16, 2019, he issued a Site Assessment Request letter based on Taylor Environmental's August 16, 2018, Closure Assessment for Replacement of Dispenser Sump. (Doc. 57-14,

---

[5] It also appears that the project manager had the incorrect email address for L. Squared's principals—spelling their name with two Ls instead of one. (Doc. 57-13, pg. 1).

pg. 1; Doc. 57-23, pg. 155:3–10). In the letter, the successor project manager advised that, due to the presence of the EDI discharge:

> Further determination will be required to establish if the contamination documented in the August 16, 2018 Closure Assessment for Replacement of Dispenser Sump (Report) and submitted by Taylor Environmental Consulting may be eligible or partially eligible for cleanup funding from the Inland Protection Trust Fund under the Early Detection Incentive Program."

(Doc. 57-14, pg. 2). FDEP acknowledged that, because there was pre-existing contamination at the site, L. Squared would clean up "[. . .] no more than the new discharge," and FDEP would remain responsible to clean up "[. . .] no more than the existing eligible contamination [. . .]." (Doc. 57-14, pgs. 1–2). A couple weeks prior, Taylor Environmental conducted soil and groundwater sampling around the STP sump, and found some petroleum impacts, but advised that it was unclear whether they were the result of a new release or the 1985 Discharge. (Doc. 57-13, pg. 1). Taylor Environmental forwarded its report to FDEP on April 16, 2019. (Doc. 57-13, pg. 1) ("In addition, we performed the soil and groundwater sampling around the STP sump on 4/15/19, which was requested in the April 19, 2018, Warning Letter. Petroleum impacts were found, but it's unclear at this time if it is from a new

release or the former release that is EDI eligible. I will forward that to you shortly.").

*L. Squared's Claim.* Herbie Wiles Insurance, Inc. completed a Liability Notice of Occurrence/Claim on behalf of L. Squared on or about April 19, 2019, stating that there appeared to be some new contamination at a dispenser sump. (Doc. 57-15). Thereafter, Taylor Environmental drafted a Comment Response/Limited Closure Assessment Report Addendum and Spill Bucket Closure Assessment Report ("Comment Response") dated June 4, 2019. (Doc. 57-18). The Comment Response was the first report which confirmed a new discharge from a covered storage tank system. (Doc. 57-18, pg. 6).

*L. Squared's Continued Assessment & Remediation.* During the pendency of the claim and litigation, L. Squared continued to work with FDEP to allocate liability for the two releases through assessment, and to assess and remediate the second release. (Doc. 49-16; Doc. 49-18; Doc. 57-20; Doc. 61-10; Doc. 61-13). These efforts were successful as FDEP issued a Site Rehabilitation Completion Order. (Doc. 49-21).

*The Nautilus Insurance Policy.* On July 16, 2018, L Squared submitted its application for insurance coverage to Nautilus or its agents. (Doc. 57-3).

In response to a question in the application inquiring as to whether there had been any pollution claims for cleanup costs made against it, L. Squared replied "no," but advised that it had received the "Warning Letter." (Doc. 57-3, Pg. 12). Elsewhere in the application, L. Squared advised that its storage tank site was in the process of being tested and that it would forward the results once received. (Doc. 57-3, pg. 13). Nautilus did not ask for additional information, but conducted underwriting based on the application and issued and delivered to L. Squared TankAdvantage Pollution Liability Policy Number CST2026735-10 ("the Policy"). (Doc. 57-4). The "Policy Period" under the Policy was July 18, 2018, to July 18, 2019, with a "Retroactive Date" of July 18, 2013. (Doc. 57-4, pgs. 7, 25).

According to the Schedule of Covered Location(s) and Covered Storage Tank System(s) in the Policy, L. Squared's Exxon gas station in St. Augustine is the covered location as defined in Section IX.7 of the Policy, the 20,000 gallon underground storage tank at the facility is the Covered Storage Tank System as defined by Section IX.8 of the Policy.

With respect to coverage for cleanup costs, the Policy states as follows:

## I.    INSURING AGREEMENT

## COVERAGE A – COVERED STORAGE TANK SYSTEM CLEANUP COSTS

1.    We will pay on behalf of the insured those sums the insured becomes legally obligated to pay as damages because of cleanup costs in excess of the deductible, if any, resulting from pollution conditions on, at or under the covered location(s) listed in the Declarations and/or in the Schedule of Covered Location(s) and Covered Storage Tank System(s) endorsement attached to this policy which result from a release of contents from any covered storage tank system(s), provided that the pollution conditions are first discovered during the policy period and reported to us in writing, during the policy period or Extended Reporting Period, if applicable. Such pollution conditions must commence on or after the Retroactive Date set forth in the Declarations and/or the Schedule of Covered Location(s) and Covered Storage Tank System(s) endorsement attached to this policy.

2.    We will pay on behalf of the insured those sums the insured becomes legally obligated to pay as damages because of cleanup costs in excess of the deductible, if any, resulting from pollution conditions emanating from the covered location(s) listed in the Declarations and/or in the Schedule of Covered Location(s) and Covered Storage Tank System(s) endorsement attached to this policy which result from a release of contents from any covered storage tank system(s), provided that the pollution

–16–

conditions are first discovered during the policy period and reported to us in writing, during the policy period or Extended Reporting Period, if applicable. Such pollution conditions must commence on or after the Retroactive Date set forth in the Declarations and/or the Schedule of Covered Location(s) and Covered Storage Tank System(s) endorsement attached to this policy.

**COVERAGE E – DEFENSE**

We will pay on behalf of the insured those costs to defend a claim or suit for bodily injury, property damage or cleanup costs to which this insurance applies. We will have no duty to defend the insured against any claim or suit for bodily injury, property damage or cleanup costs to which this policy does not apply. Our duty to defend or continue defending any such claims or suits and to pay any bodily injury, property damage, cleanup costs or defense costs, charges and/or expenses, shall cease once the applicable Limit of Liability, as described in the Declarations and Section IV. Limits of Liability, has been exhausted.

(Doc. 57-4, pgs. 10–11). In addition to not covering pollution conditions that

commenced prior to the Retroactive Date, the Policy expressly excludes from

coverage "Known Pollution Conditions," which it defines as "Pollution con-

ditions known to exist prior to the inception of this policy by any insured."

(Doc. 57-4, pg. 13).

The following relevant definitions in the Policy are incorporated into the coverage for Covered Storage Tank System Cleanup Costs:

### IX.  DEFINITIONS

5.  **Claim, Claims, or Claimed**

Means a written demand received by an insured seeking a remedy and alleging liability or responsibility on the part of the insured for bodily injury, property damage, and/or cleanup costs.

7.  **Covered Location(s)**

Means any location(s) listed in the Declarations and/or listed within the Schedule of Covered Location(s) and Covered Storage Tank System(s) endorsement.

8.  **Covered Storage Tank System(s)**

Means any above ground storage tank or underground storage tank listed in the Declarations and/or listed within the Schedule of Covered Location(s) and Covered Storage Tank System(s) endorsement.

14.  **Pollution Condition(s)**

Means the discharge, dispersal, release, seepage, migration, or escape of any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and

waste into or upon land, or any structure on land, the atmosphere or any watercourse or body of water, including groundwater. Waste includes materials to be recycled, reconditioned or reclaimed.

16. **Release**

Means the discharge, dispersal, or escape of any solid, liquid, gaseous or thermal irritant, contamination or pollutant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste from a covered location(s) and/or covered storage tank system(s) into groundwater, surface water, or surface or subsurface soils, which a pollution condition has been investigated and confirmed by or on behalf of an insured, utilizing a system tightness check, site check or other procedure approved by the Federal Environmental Protection Agency or a state or local agency having jurisdiction over the covered location(s) and/or covered storage tank system(s) and in accordance with 40 Code of Federal Regulations 280.52 or any other applicable federal or state regulation or state statute.

18. **Storage tank system(s)**

Means any tank(s) including any connected piping and equipment attached thereto.

20. **Underground Storage Tank**

> Means any tank with associated piping and equipment connected thereto which has more than ten (10) percent of its volume below ground and would otherwise not be defined as an above ground storage tank by federal or state law.

(Doc. 57-4, pgs. 22–24).

Additionally, the Policy outlines when and under what circumstances an insured must provide notice to Nautilus. It states:

### VI.  REPORTING OF A POLLUTION CONDITION, CLAIM OR SUIT

> 1.  You must see to it that we are notified as soon as reasonably possible, but in any event, not more than seven (7) days after the insured first became aware of, or should have become aware of a **pollution condition** which may result in a **claim** or any action or proceeding to impose an obligation on the **insured** for **cleanup costs**. Notice should include:
>
>    (a)  How, when and where the **pollution condition** took place;
>
>    (b)  The names and addresses of any injured persons and witnesses; and
>
>    (c)  The nature and location of any injury or damage arising out of the **pollution condition**.

(Doc. 57-4, pg. 19) (emphasis in original).

–20–

***Nautilus Denies L. Squared's Claim.*** Nautilus replied to L. Squared with a position statement dated June 12, 2019, denying the claim. (Doc. 57-16). Specifically, Nautilus claimed that NDN had discovered the pollution conditions in 2017—which was prior to the Policy Period, and which rendered it excluded as a "Known Pollution Condition." (Doc. 57-16, pg. 6). Importantly, Nautilus did not deny the claim based on any alleged untimeliness of L. Squared's reporting of "pollution conditions." (Doc. 57-16).

***The Lawsuit.*** On October 1, 2021, L. Squared filed suit in the Circuit Court for the Seventh Judicial Circuit, in and for St. Johns County, Florida, seeking a declaration of its rights under the Policy and for breach of contract. (Doc. 1-2, pg. 5–21). On November 1, 2021, Nautilus filed a Notice of Removal in the United States District Court for the Middle District of Florida, based on diversity jurisdiction. (Doc. 1).

On December 3, 2021, Nautilus filed its Answer and Affirmative Defenses. (Doc. 12). Nautilus' 17 affirmative defenses included its claim that there is no coverage under the policy because the "'pollution condition' was not 'first discovered' during the policy period"; coverage is barred under the Policy's "Known Pollution Conditions" exclusion; there "is no coverage to

the extent that the Policy is void based on material representations by [L. Squared] in its insurance policy application"; and there is no coverage because L. Squared breached certain provisions under the Policy, like prompt reporting, prompt notice, and assistance and cooperation. (Doc. 12, pg. 8–9).

After conducting extensive discovery, the parties filed cross motions for summary judgment. (Doc. 51; Doc. 57). In its motion, L. Squared argued, *inter alia*, that Nautilus is liable to pay its "cleanup costs" under the Policy because, contrary to Nautilus' claims, L. Squared did not "first discover" the pollution conditions that are the subject of the claim until it investigated and confirmed that the pollution conditions were the result of a "release" from a "covered storage tank system(s)," which occurred in June 2019. (Doc. 57, pgs. 16–22). Specifically, L. Squared argued that the terms of the Policy requred it to investigate and confirm that the pollution conditions were the result of a new discharge, and not the 1985 Discharge, which was clearly excluded. (Doc. 57, pgs. 16–22). Alternatively, L. Squared argued that the policy terms were ambiguous and that such ambiguity should be resolved in its favor. (Doc. 57, pgs. 22–24).

L. Squared reasoned that "first discovered," as used in the Policy, had to mean when it first confirmed that the contamination was not the result of

the 1985 Discharge, but rather, a new release from a covered storage tank system. (Doc. 57, pg. 20). Otherwise, every time there is a sampling event to assess the 1985 Discharge, there is a "discovery" of a "pollution condition," albeit not a "first discovery," and L. Squared—along with every other insured with pre-existing "pollution conditions" that would not be covered under a policy—would have to report the discovery just in case it was unknowingly making the "first" discovery of a "new discharge." (Doc. 57, pg. 21). L. Squared also sought summary judgment on its entitlement to its Defense Costs under Coverage E in the Policy. (Doc. 57, pgs. 25–8; Doc. 57-4, pg. 11).

In its motion for summary judgment, Nautilus argued that there was no coverage because L. Squared "first discovered" the pollution conditions in July 2017, which was not during the policy period and which rendered the pollution conditions "Known Pollution Conditions." (Doc. 51). Additionally, Nautilus argued that L. Squared had breached the 7-Day Notice Provision in the Policy, which, it claimed, required L. Squared to report the "pollution conditions" to Nautilus within 7 days of when it "first became aware of, or *should have become aware of* a pollution condition which *may result* in a claim, or any action or proceeding to impose an obligation on

the insured for cleanup costs," which it claimed was August 2018 when L. Squared received the report from Taylor Environmental. (Doc. 51, pgs. 22–23) (emphasis in original). Thereafter, both parties filed responses to the other's respective motions for summary judgment, (Doc. 65; Doc. 66), and replies to the other's respective responses, (Doc. 76; Doc. 77).

On June 23, 2023, the District Court entered an order granting Nautilus' motion for summary judgment and denying L. Squared's. (Doc. 89). In the order, the District Court agreed with Nautilus, holding that the phrase "first discovered" is not ambiguous and that it means when L. Squared "first became aware of, or should have become aware of a *pollution condition*," which the District Court reasoned was July 2017 when L. Squared took "corrective action" in response to a directive by FDEP. (Doc. 89, pg. 16) (emphasis added). The District Court was persuaded that L. Squared had admitted to first discovering the pollution conditions in July 2017 when it identified the "date of discovery" as such in the Discharge Reporting Form it submitted to FDEP. (Doc. 89, pgs. 16–17). And, since July 2017 is before the effective date of the policy, also making it a "Known Pollution Condition," Nautilus was not liable to pay L. Squared's cleanup costs. (Doc. 89, pg. 17). The Dis-

trict Court rejected L. Squared's argument that its duty to report the pollution conditions was not triggered until April 2019 when the contamination was confirmed to result from a "new discharge," or when FDEP first required site assessment by letter dated April 16, 2019. (Doc. 57-14; Doc. 89, pgs. 18–19). The Court held that it did not matter whether the contamination was from the 1985 Discharge or a new release because the Policy required L. Squared to report the discovery of [any] pollution conditions "which may result in a claim" even if the "pollution conditions" were pre-existing and not the subject of a claim. (Doc. 89, pgs. 18–19). On June 27, 2023, the District Court entered a Final Judgment in favor of Nautilus. (Doc. 90).[6]

On July 21, 2023, L. Squared moved for reconsideration in accordance with Federal Rule of Civil Procedure 59(e) and 60(a)(6), arguing that the District Court had misconstrued the Policy. (Doc. 93). Nautilus filed its response in opposition on August 11, 2023. (Doc. 99). And, on August 29, 2023, the

---

[6] Though rendered moot by the District Court's approval of Nautilus' coverage denial, the District Court also denied L. Squared's request for summary judgment on the choice-of-law issue; specifically, the Policy contains a New York choice-of-law provision which, L. Squared argued, is prohibited under Florida Administrative Code Rule 62-761.420(7).

District Court entered an order denying L. Squared's motion for reconsideration. (Doc. 101). On September 15, 2023, L. Squared filed a notice of appeal to this Court seeking review of both the order granting summary judgment for Nautilus, and the order denying L. Squared's motion for reconsideration. (Doc. 102).

<h2 style="text-align:center">SUMMARY OF THE ARGUMENT</h2>

This case involves a simple matter of contract interpretation—more precisely, an insurance policy—and really only the interpretation of two phrases in the Policy—"pollution conditions" and "first discovered." The Policy only covers "pollution conditions" that are the result of a release from a covered storage tank system that commenced after the Policy's Retroactive Date (July 18, 2013), so long as L. Squared "first discovered" the release and reported it to Nautilus during the policy period (July 18, 2018 through July 18, 2019). The Policy also expressly excludes "Known Pollution Conditions"; *i.e.*, those known to exist prior to the inception of the Policy.

| Pollution Conditions (Resulting from the 1985 Discharge) | Pollution Conditions (Resulting form a new discharge from a covered storage tank system) |
|---|---|
| Not Covered (under any circumstances) | Covered (if commenced after the Retroactive Date, and first discovered and reported to Nautilus during the policy period) |

Simple enough. But, a problem arises when a covered storage tank system is located in an area known to have been polluted by the 1985 Discharge. If contamination is detected, does the Policy cover any resulting cleanup costs? The only way to know is by investigating and confirming the source of the contamination. It just so happens that is precisely what the Policy requires.

The Policy only covers "pollution conditions" that are the result of a "release" from a covered storage tank system. Under the Policy, a "release" is a discharge from a covered storage tank system where the "pollution condition" has been investigated and confirmed using government-sanctioned means.

In this case, L. Squared detected contamination in 2017 in an area known to have been polluted by the 1985 Discharge where a covered storage

tank system had been installed. As required by the Policy, L. Squared investigated and, in April 2019 confirmed that the contamination was the result of a release from a covered storage tank system. Upon receiving confirmation, L. Squared promptly notified Nautilus and filed a claim.

Nautilus denied the claim because, in its view, L. Squared should have notified it in 2017 when the contamination was detected even though all indications, including the opinions of L. Squared's contractors, suggested that the contamination was the result of the 1985 Discharge and, thus, not covered. The District Court agreed and found that L. Squared's notice of claim was untimely, that the "pollution condition" was "first discovered" prior to the Policy's inception date, thereby making it a "Known Pollution Condition."

L. Squared contends that the District Court misconstrued the Policy by adopting an interpretation of "first discovered" that is contrary to its plain and ordinary meaning, and that makes little sense in the context of the Policy. Additionally, at a minimum, the phrase is ambiguous and any ambiguity should have been resolved in favor of L. Squared and finding coverage. Furthermore, even if L. Squared's notice of claim was untimely, coverage may only be denied if Nautilus was prejudiced—which it failed to plead or

argue at summary judgment. Moreover, several of the District Court's findings are clearly erroneous or involve genuinely disputed issues of material fact. For these reasons, as outlined in greater detail below, this Court should reverse the Final Judgment.

## STANDARD OF REVIEW

In this appeal, L. Squared seeks review of an order granting the motion for summary judgment filed by Nautilus, and denying the motion for summary judgment filed by L. Squared. This Court reviews *de novo* the District Court's grant or denial of summary judgment, and reviews its findings of fact for clear error. *Carithers v. Mid-Continent Cas. Co.*, 782 F. 3d 1240, 1245 (11th Cir. 2015) (citing *Cagle v. Bruner*, 112 F. 3d 1510, 1514 (11th Cir. 1997)); *Levinson v. Reliance Stand. Life Ins. Co.*, 245 F. 3d 1321, 1325 (11th Cir. 2001).

Furthermore, contract interpretation is subject to the same *de novo* review. *Am. Cas. Co. v. Etowah Bank*, 288 F. 3d 1282, 1285 (11th Cir. 2002). Because insurance policies are considered contracts, "[i]nterpretation of insurance policy language is [also] a matter of law, subject to *de novo* review." *Graber v. Clarendon Nat'l Ins. Co.*, 819 So. 2d 840, 842 (Fla. Dist. Ct. App. 2002) (citing *Coleman v. Fla. Ins. Guar. Ass'n*, 517 So. 2d 686 (Fla. 1988)); *see also Mich. Millers Mut. Ins. Corp. v. Benfield*, 140 F. 3d 915, 924 (11th

Cir. 1998). Moreover, in cases where insurance contract language "is susceptible to more than one reasonable interpretation, one providing coverage and the other limiting coverage," "courts should resolve the ambiguity in favor of the insured by adopting the reasonable interpretation of the policy's language that provides coverage, rather than the competing interpretation that does not." *Travelers Indem. Co. v. PCR Inc.*, 889 So. 2d 779, 785–86 (Fla. 2004) (internal quotation marks and citations omitted).

## ARGUMENT

I.  **The District Court erred in granting summary judgment for Nautilus and denying summary judgment for L. Squared; therefore, this Court should reverse the Final Judgment.**

### *Introduction*

This matter should be straightforward. L. Squared purchased an insurance policy that covers cleanup and defense costs resulting from post-Retroactive Date pollution conditions in or around a covered area and confirmed during the policy period to have come from a covered storage tank system. Unfortunately, this case is complicated by the presence of pre-existing contamination that is already being remediated under a state-funded program. There is no dispute that this pre-existing contamination is not covered under

the Policy, nor is L. Squared responsible for its remediation. Indeed, no insurer would cover costs for contamination discovered more than 35 years ago. As stated above, 40 C.F.R. 280.97 requires insurance coverage for "accidental releases," not "pollution conditions."

The seeds of the complication in this case began in 2017 when petroleum constituents were detected in an area known to have been polluted by the pre-existing contamination. Notwithstanding that the substances were detected when the state directed the repair of cracked boots—a condition not known to result in leaks—there was every reason to believe that the pre-existing contamination was the source. Not only did the FDEP inspector say so, but contractors hired by L. Squared expressed that view, and the state just wanted to know one way or another. L. Squared moved forward with this investigation and corrective action, the costs for which it sought to receive as Defense Costs under the Policy.

So, in consultation with, and under the direction of, the state, L. Squared endeavored to discover whether the source of the petroleum constituents was the pre-existing contamination or a new discharge. In April 2019, after multiple rounds of testing, L. Squared finally received confirma-

tion from its contractor that the source was, indeed, a new discharge. Interestingly, it was not until months later that the state agreed. Accordingly, L. Squared submitted a Liability Notice of Occurrence/Claim to Nautilus seeking coverage for its cleanup and defense costs. This dispute arose because Nautilus denied coverage, claiming that "pollution conditions" were "first discovered" prior to the inception of the policy.

In granting summary judgment for Nautilus, the District Court found that L. Squared "first discovered" the pollution conditions in 2017—making its 2019 notice to Nautilus untimely. By that rationale, every assessment by FDEP of the 1985 Discharge would be a "discovery" of pollution conditions. If we say pollution conditions were "first discovered" in 1985, then it would take the discovery of a new release to constitute "first discovery" of pollution conditions. Even though L. Squared had not yet confirmed that the source of the petroleum constituents was a covered storage tank system, and not the pre-existing contamination that everyone believed it to be, the Court held that L. Squared had a duty to report the detection to Nautilus within seven days. Having failed to do so, the Court concluded that the insurance policy did not cover the pollution conditions and, thus, Nautilus is entitled to judgment as a matter of law. L. Squared contends that this was error because,

under the plain language of the Policy, "first discovered" means when, after

investigation and confirmation, L. Squared learned that the pollution condi-

tions were the result of a new discharge.

### A.    The District Court misconstrued the Policy.

The District Court misconstrued the Policy. Under Florida law,[7] courts

must construe an insurance policy in its entirety, striving to give every pro-

vision meaning and effect. *Excelsior Ins. Co. v. Pomona Park Bar & Package*

*Store,* 369 So. 2d 938, 941 (Fla. 1979). In interpreting insurance policies, Flor-

ida courts start with the plain language of the policy as bargained for by the

parties. If that language is unambiguous, it governs. However, if the relevant

policy language is susceptible to more than one reasonable interpretation,

one providing coverage and the other limiting coverage, the insurance pol-

icy is considered ambiguous, and must be interpreted liberally in favor of

the insured and strictly against the insurer. *Id.* (quoting *Auto-Owners Ins. Co.*

*v. Anderson,* 756 So. 2d 29, 34 (Fla. 2000)) (internal quotation marks omitted).

---

[7] *See State Farm Fire and Cas. Co. v. Steinberg,* 393 F. 3d 1226, 1230 (11th Cir. 2004) (stating "[b]ecause federal jurisdiction over this matter is based on diversity, Florida law governs the determination of the issues on this appeal.").

### 1. The District Court's interpretation of "first discovered" does not comport with the term's plain and ordinary meaning.

The District Court's interpretation of "first discovered" does not comport with the term's plain and ordinary meaning within the context of Coverage A. In the Order, the District Court found that L. Squared "first discovered" the "pollution conditions" in 2017 and that the Policy required L. Squared to report the pollution conditions at that point even though the source of the contamination—or the actual existence of a release for that matter– had not yet been determined and was, in fact, presumed to have been the pre-existing contamination. This interpretation and application are contrary to the plain and ordinary meaning of the phrase "first discovered."

Setting aside the word "first," one cannot "discover" a previously known pre-existing contamination. "Discover" means: (1) to make known or visible : EXPOSE; (2) to obtain sight or knowledge of for the first time : FIND; or (3) find out. https://www.merriam-webster.com/dictionary/discover (last visited July 19, 2023). So, it is impossible to "discover" pre-existing contamination that was well known to all parties involved; and it certainly is impossible to "first discover" a pre-existing contamination that was initially discovered over 35 years ago. So, contrary to the District Court's finding, the

term "first discovered" can only refer to newly objectively discovered discharges; i.e., those that result from a release from a covered storage tank system. Indeed, unlike the District Court's interpretation, this interpretation is in line with the rest of the Policy's provisions.

**2.    Within the context of the Policy, the plain and ordinary meaning of the phrase "first discovered" means when, after investigation and confirmation, L. Squared learned that the pollution conditions were the result of a new discharge.**

Within the context of the Policy, the plain and ordinary meaning of the phrase "first discovered" means when, after investigation and conformation, L. Squared learned that the pollution conditions were the result of a new discharge. Coverage A of the Policy identifies what is and what is not covered under the Policy. It provides:

**COVERAGE A — COVERED STORAGE TANK SYSTEM CLEANUP COSTS**

1.    We will pay on behalf of the insured those sums the insured becomes legally obligated to pay as damages because of cleanup costs in excess of the deductible, if any, resulting from **pollution conditions on, at or under the covered location(s)** listed in the Declarations and/or in the Schedule of Covered Location(s) and Covered Storage Tank System(s) endorsement attached to this policy **which result from a release of contents** from any **covered storage tank system(s)**,

> provided that the **pollution conditions are first discovered during the policy period** and **reported to us in writing, during the policy period or Extended Reporting Period**, if applicable. Such pollution conditions must commence on or after the Retroactive Date set forth in the Declarations and/or the Schedule of Covered Location(s) and Covered Storage Tank System(s) endorsement attached to this policy.

(Doc. 57-4, pg. 10) (emphasis added).

The Policy defines certain terms used in Coverage A that are crucial in understanding its plain language.[8] *See generally* (Doc. 54-7, pgs. 22–24). For example, under the Policy:

> "Pollution Condition(s)" means the discharge, dispersal, **release**, seepage, migration, or escape of any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste into or upon land, or any structure on land, the atmosphere or any watercourse or body of water, including groundwater. Waste includes materials to be recycled, reconditioned, or reclaimed. (Doc. 57-4, pg. 23) (emphasis in original).

---

[8] "Covered Location(s)" means any location(s) listed on the Declarations and/or listed within the Schedule of Covered Location(s) and Covered Storage Tank System(s) endorsement. (Doc. 57-4, pg. 23). "Covered Storage Tank System(s)" means any above ground storage tank or underground storage tank listed in the Declarations and/or listed within the Schedule of Covered Location(s) and Covered Storage Tank System(s) endorsement. (Doc. 57-4, pg. 23).

–36–

> "Release" means the discharge, dispersal, or escape
> of any solid, liquid, gaseous or thermal irritant, con-
> tamination or pollutant, . . . , **from a covered loca-
> tion(s) and/or covered storage tank system(s)** into
> groundwater, surface water or subsurface soils,
> which a **pollution condition** has been **investigated
> and confirmed** by or on behalf of an insured, utiliz-
> ing a system tightness check, site check or other pro-
> cedure approved by the Federal Environmental Pro-
> tection Agency or a state or local agency having ju-
> risdiction over the covered location(s) and/or cov-
> ered storage tank system(s) . . . . (Doc. 57-4, pg. 24)
> (emphasis added).

Accordingly, to be covered under the Policy, the "pollution condi-

tions" must:

- Be "on, at or under" the listed "covered location(s)";

- Result from the "release" of contents from any "covered storage
  tank system(s) that has investigated and confirmed using state-
  sanctioned methods;

- Be "first discovered" during the policy period;

- Be reported to Nautilus during the policy period or the Extended
  Reporting Period, if applicable; and

- Commence on or after the Retroactive Date set forth in the Policy.

The Policy does not define "first discovered." However, as explained

above, the phrase can only mean newly objectively discovered discharges;

*i.e.*, those that result from a new release from a covered storage tank system.

Furthermore, the Policy expressly excludes from coverage "Known Pollution Conditions," which are defined as "[p]ollution conditions known to exist prior to the inception of this policy by any insured." (Doc. 57-4, pg. 13). This definition further supports the conclusion that "first discovered" means confirmation of a new release from a covered storage tank system; after all, one cannot discover a known pollution condition and, even if one could, it would be expressly excluded under the Policy. In short, "pollution conditions" are "first discovered" when their source has been investigated and confirmed to be a release from a covered storage tank system. It should be noted that while Coverage A of the Policy purports to cover "pollution conditions," the true issue is whether a release occurred. Recall that 40 C.F.R. 280.97 requires these policies to cover accidental "releases," and it even requires insurers to certify that they do.

### 3. L. Squared first discovered and timely reported the pollution condition in April 2019 once its source was confirmed to be a new discharge from a covered storage tank system.

L. Squared first discovered and timely reported the pollution condition in April 2019 once its source was confirmed to be a new discharge from a covered storage tank system. As explained above, Coverage A requires the

pollution condition be first discovered during the policy period and reported to Nautilus in writing, during the policy period or Extended Reporting Period in order for any claimed cleanup costs to be covered. (Doc. 57-4, pg. 10).

Here, the earliest it may be said that L. Squared "first discovered" the pollution condition is April 2019, when Taylor Environmental conducted an additional closure assessment and determined that there appeared to be a "new release." (Doc. 57-18, pgs. 5–6). Taylor Environmental reported the new discharge to FDEP in a Discharge Report Form submitted on April 16, 2019. (Doc. 57-18, pg. 6). Three days later, on April 19, 2019, L. Squared reported the pollution condition to Nautilus. (Doc. 57-15).[9] Since both the discovery and the reporting occurred during the policy period—July 18, 2018 to July 18, 2019—Nautilus is liable to pay L. Squared's cleanup costs in accordance with the Policy. (Doc. 57-4). Accordingly, the District Court erred

---

[9] Taylor Environmental confirmed that the pollution condition emanated from a new discharge from a covered storage tank system in its Comment Response/Limited Closure Assessment Report Addendum and Spill Bucket Closure Assessment Report ("Comment Response") dated June 4, 2019. *See* (Doc. 57-18, pg. 5-6) ("The March 13, 2017 Source Removal Report document that all petroleum-impacted soil present in and around the former UST area was removed; therefore, this appears to be a new release, which was reported in the April 16, 2019 DRF.").

in concluding that that Nautilus was not liable based on L. Squared's purported untimely notice.[10]

### B. At a minimum, the phrase "first discovered" as used in the Policy is ambiguous and any ambiguity should have been resolved in favor of L. Squared and providing coverage.

At a minimum, the phrase "first discovered" as used in the Policy is ambiguous and any ambiguity should have been resolved in favor of L. Squared and providing coverage. Generally, if the relevant policy language is susceptible to more than one reasonable interpretation, one providing coverage and the other limiting coverage, the insurance policy is considered ambiguous, and must be interpreted liberally in favor of the insured and strictly against the insurer. *Excelsior Ins. Co. v. Pomona Park Bar & Package Store,* 369 So. 2d 938, 941 (Fla. 1979) (quoting *Auto-Owners Ins. Co. v. Anderson,* 756 So.

---

[10] The Policy also requires that the pollution condition commence on or after the Policy's Retroactive Date in order for Nautilus to be liable for L. Squared's cleanup costs. (Doc. 57-4, pg. 10). There is no dispute that the pollution conditions at issue in this case commenced on or after the Policy's July 18, 2013 Retroactive Date. (Doc. 57-4, pg. 25). The undisputed evidence established that "[i]t is more likely than not that the 'new' discharge occurred after July 18, 2013, and most likely between May 13, 2015, when an FDEP inspection did not indicate any relevant issues with the storage tank system[,] and August 25, 2017, when Guardian replaced the dispenser and tank sump boots." (Doc. 57-19, pg. 4).

2d 29, 34 (Fla. 2000)) (internal quotation marks omitted). *See also Herring v. First S. Ins. Co.*, 522 So. 2d 1066, 1068 (Fla. 1st DCA 1988); *Ideal Mut. Ins. Co. v. C.D.I. Constr., Inc.,* 640 F. 2d 654, 657 (5th Cir. 1981) (holding that an insurance policy is ambiguous if it is susceptible to two or more reasonable interpretations that can fairly be made).

In this case, L. Squared contends that the only reasonable interpretation of "first discovered" under the policy can only refer to newly objectively discovered discharges; *i.e.*, those that result from a release from a covered storage tank system, which, after all, is what the Policy is required to cover under 40 C.F.R. 280.97. Indeed, the plain meaning of "first discovered" simply cannot apply to the detection of pre-existing pollution conditions like the 1985 Discharge, and a correct reading of the entire Policy supports this interpretation. *Excelsior Ins. Co. v. Pomona Park Bar & Package Store,* 369 So. 2d 938, 941 (Fla. 1979) (quoting *Auto-Owners Ins. Co. v. Anderson,* 756 So. 2d 29, 34 (Fla. 2000)) (internal quotation marks omitted); *Herring v. First S. Ins. Co.,* 522 So. 2d 1066, 1068 (Fla. 1st DCA 1988); *Ideal Mut. Ins. Co. v. C.D.I. Constr., Inc.,* 640 F. 2d 654, 657 (5th Cir. 1981).

However, assuming *arguendo* that the District Court's interpretation—that "first discovered" means first detected, irrespective of whether the pollution condition was the result of the 1985 Discharge or a new discharge—is reasonable, then the phrase "first discovered" is ambiguous and, as such, the ambiguity should have been resolved in favor of L. Squared and finding coverage. Therefore, it was error for the District Court to hold that Nautilus was entitled to judgment as a matter of law.

### C.   The District Court erred in finding that a failure the notify Nautilus of the pollution condition within seven (7) days resulted in the denial of coverage.

The District Court erred in finding that a failure to notify Nautilus of the pollution condition within seven (7) days resulted in a lack of coverage. In Florida, notice is a condition precedent to coverage, and an insured's failure to provide "timely notice of loss in contravention of a policy provision is a legal basis for the denial of recovery under the policy." *Ideal Mut. Ins. Co. v. Waldrep,* 400 So. 2d 782, 785 (Fla. 3d DCA 1981). If an insured's notice is untimely, prejudice to the insurer is presumed; however, this presumption is rebuttable provided that the insured can demonstrate that no prejudice in fact occurred. *Clena Invs., Inc. v. XL Specialty Ins. Co.,* No. 10–cv–62028, 2012 WL 1004851, at *4 (S.D. Fla. Mar. 26, 2012) (citations omitted); *see also Mount*

*Vernon Fire Ins. Co. v. Editorial Am., S.A.,* 374 So. 2d 1072, 1074 (Fla. 3d DCA1979).

So, to prevail on summary judgment on notice grounds, a party must first demonstrate through undisputed facts (1)that notice was untimely under the policy, and (2) that prejudice exists, either by operation of the unrebutted presumption or otherwise. *See Mid–Continent Cas. Co. v. Basdeo,* 742 F. Supp. 2d 1293, 1335 (S.D. Fla. 2010).

In this case, the District Court concluded that L. Squared's purported untimely notice entitled Nautilus to judgment as a matter of law. However, Nautilus neither alleged prejudice in its Answer and Affirmative Defenses,[11] nor offered any argument or proof of prejudice in its motion for summary judgment. (Doc. 12; Doc. 51). In fact, the District Court reached its conclusion without considering the issue of prejudice at all. *See generally* (Doc. 89). This was error. *Clena Invs., Inc. v. XL Specialty Ins. Co.,* No. 10–cv–62028, 2012 WL 1004851, at *4 (S.D. Fla. Mar. 26, 2012) (citations omitted); *see also Mount Vernon Fire Ins. Co. v. Editorial Am., S.A.,* 374 So. 2d 1072, 1074 (Fla. 3d

---

[11] Though Nautilus raised the issue of untimely notice in its Seventh Affirmative Defense, it did not allege prejudice. *See* (Doc. 12, pg. 9).

DCA1979); *Mid–Continent Cas. Co. v. Basdeo,* 742 F. Supp. 2d 1293, 1335 (S.D. Fla. 2010).

In any event, there is ample record evidence to demonstrate that Nautilus suffered no prejudice. For instance, the record is replete with the back and forth correspondence between FDEP and L. Squared's contractors as L. Squared continued to remediate and take corrective action during the pendency of this litigation. *E.g.,* (Doc. 57-19, pg. 1) ("I have since been performing assessment activity and consulting with counsel for L. Squared in discussions with FDEP to arrive at an allocation of costs between L. Squared and FDEP for completion of cleanup at the site."); (Doc. 57-14). *See also* (Doc. 49-16; Doc. 49-18; Doc. 50-20; Doc. 61-10; Doc. 61-13); and the FDEP order absolving the Maleys (and Nautilus) of further responsibility. (Doc. 49-21). As part of this litigation, L. Squared sought to recover both its corrective action costs and its Defense Costs under the Policy, which it defined as the actions it took to limit and resolve with FDEP its (read: Nautilus') liability for the new release. *E.g.,* (Doc. 57-1, pg. 15).

This evidence showing that Nautilus was not prejudiced by the purported late notice is best summarized by Darrin McKeehen of FDEP in his deposition:

> Q.  Is it fair to say that Mr. Ullo [L. Squared's attorney] and Mr. Taylor were working with the department to try to make sure that responsibility for the two discharges was properly allocated as between the department and L. Squared?
>
> A.  Yes, sir.

(Doc. 57-23, pg. 152:11-16). Accordingly, it was error to conclude that Nautilus is entitled to judgment as a matter of law based on L. Squared's purported untimely notice.

### D.  Several of the District Court's findings are clearly erroneous or involve genuinely disputed material facts.

Several of the District Court's findings are clearly erroneous or involve genuinely disputed material facts. "Summary judgment will not lie if a dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *U.S. v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

Several of the District Court's findings are clearly erroneous or involve genuinely disputed material facts. For example, the District Court found:

"After FDEP reviewed the report, it determined that the report was not 'in compliance with' Department guidelines and further corrective action needed to be completed, including more sampling." (Doc. 89, pg. 5). This finding is clearly erroneous because it misconstrues the evidence and fails to account for Florida law. Specifically, FDEP was not ordering "corrective action," but rather the filing of a Discharge Report Form and the conduct of additional sampling to determine whether a release had occurred. *See* (Doc. 57-9). While it is true that FDEP concluded that the report did not fully comply with its Closure Assessment Guidelines, the reason for this conclusion is that the Department's Closure Assessment Guidelines are part of its Storage Tank Rule, chapter 62-761, Florida Administrative Code. *See* Fla. Admin. Code R. 62.761.600. The purpose of the Guidelines is to determine whether there has been a release. Fla. Admin. Code R. 62.761.600(1)(a) ("Storage tank systems shall have a method, or combination of methods, of release detection that can detect new release from any portion of the storage tank system."). Closure Assessments are used to determine whether a discharge has occurred and are required under rule 62-761.600. Fla. Admin. Code. Corrective action is not required unless the Department determines that there has,

in fact, been a release, in which case, different regulations, chapter 62-780, Florida Administrative Code, apply.

Next, the District Court found:

> The Discharge Report Form (DRF) identifies that the leak was discovered in July 2017. The DRF also identified that the discharged substance was gasoline and diesel and that it was affecting soil and groundwater.

(Doc. 89, pgs. 5-6). This is a genuinely disputed issue of material fact. As explained above, a DRF is required when there is a "confirmed discharge" *or* when visual observations or analytical tests (surface, groundwater, or soil) indicate the presence of contamination, or in the event of a spill or overfill of a regulated substance. So, contrary to the District Court's finding, the simple act of filing a DRF does not necessarily indicate the discovery of a discharge.

This is especially true in this case where L. Squared's corporate representative testified that it submitted the DRF at the Department's insistence, but did not believe there had been a discharge. (Doc. 57-17, pgs. 21:11–24; 62:11–63:3; 71:13–72:20; 76:12–20; 114:17–24; 137:4–19; 157:20–158:2; 170:5–172:11–15). *See also* (Doc. 57-9) (FDEP letter dated March 8, 2018, directing L. Squared to file a Discharge Reporting Form); (Doc. 89, pg. 6, n.1) (noting that the Discharge Reporting Form was filed on March 8, 2018).

Furthermore, L. Squared had previously filed an Incident Notification Form ("INF") that noted the cracked spill buckets. (Doc. 57-7). Under rule 62-761.430(5), Florida Administrative Code, and the Instructions accompanying the DRF, the DRF must be submitted within 14 days of the INF if an investigation following the INF cannot rule out a discharge. In this case, more than 14 days had passed, both because L. Squared did not receive the Department's response to the report (which was sent to an incorrect email address) (Doc. 57-17, pgs. 54:22–55:1; Doc. 57-13, pg. 1) and because the Department was requiring additional sampling as part of the Closure Assessment. So, contrary to the District Court's finding, L. Squared did not submit the DRF to report the discovery of a discharge, rather, it did so because FDEP rules required a DRF to be filed since the incident notification had not yet been resolved.

Next, the District Court found:

> The DRF also instructs the signee to 'remember to properly notify your insurance company of this reported discharge in accordance with the reporting requirements outlined in your insurance policy.'

(Doc. 89, pg. 6). Again, filing the DRF had nothing to do with the discovery of a discharge; L. Squared filed the DRF at FDEP's insistence because the

incident reported in the INF had not yet been resolved. At this point, the Closure Assessment was not complete and the only sampling report that identified contamination noted that the contamination should be handled as part of the 1985 EDI discharge. *See* (Doc. 57-8, pg. 8) ("The site is currently registered in the FDEP Petroleum Restoration Program and is awaiting funding for further assessment."); (Doc. 57-12, pg. 4) ("Taylor recommends addressing the groundwater contamination discovered at dispenser 5/6 as part of the EDI-funded assessment and cleanup.").

In any event, FDEP's suggestion was not to simply notify the insurer, but to notify the insurer "in accordance with its reporting requirements." As explained elsewhere in this brief, the policy required reporting only after there had been an investigation and confirmation of a covered discharge.

The District Court's finding that "On May 23, 2017[,] FDEP inspected Plaintiff's St. Augustine gas station and directed Plaintiff to take corrective action" is also clearly erroneous. (Doc. 89, pg. 16). The phrase "corrective action" is a term of art and, in this context, it connotes assessment and remediation. *See* https://www.epa.gov/hw/learn-about-corrective-action#the-process (last visited July 21, 2023). FDEP gave no such directive until April 16, 2019, when FDEP first states that a site assessment was required. (Doc.

57-14); (Doc. 57-23, pgs. 4–10). The undisputed evidence established that the FDEP inspector directed L. Squared to make repairs to a cracked boot and conduct hydrotesting to determine whether a discharge had occurred. (Doc. 57-6, pg. 4). The inspector specifically stated that there was "[n]o indication of release." (Doc. 67-6, pg. 4). Because L. Squared had to make repairs, it had to do a closure assessment, which is not "corrective action." It is designed to determine whether a release has occurred. If a release has occurred, only then would corrective action be required.

The District Court's finding that "In taking the corrective action, by July 2017, Plaintiff knew pollution conditions existed" is likewise clearly erroneous and is also a genuinely disputed issue of material fact. As discussed above, filing a DRF does not necessarily indicate the discovery of a discharge; rather, as in this case, it reports the detection of contamination. Further, the DRF had to be filed because there was an unresolved Incident Notification Form relating to the July 2017 inspection. Fla. Admin. Code R. 62-761.430(5). That is the source of the July 2017 date on the DRF. L. Squared's corporate representative testified that it filed the DRF only because FDEP required it. (Doc. 57-17, pgs. 21:11–24; 62:11–63:3; 71:13–72:20; 76:12–20; 114:17–24; 137:4–19; 157:20–158:2; 170:5–172:11-15). L. Squared had no

knowledge of a release from a covered storage tank system, nor knowledge of any "pollution conditions" other than the pre-existing contamination.

The District Court also found:

> When signing the DRF Plaintiff was specifically instructed to notify Defendant about the notified discharge. (Doc. 89, pg. 16).
>
> [***]
>
> It is undisputed that Plaintiff knew by March 8, 2018 [the date of the DRF] that gasoline and diesel were leaking from Plaintiff's facility. (Doc. 89, pgs. 16–17).
>
> [***]
>
> Even if that [Plaintiff's] representative did not know whether pollution conditions existed in July 2017, that representative knew the pollution conditions existed on March 8, 2018, which was before the insurance policy took effect. (Doc. 89, pg. 17).
>
> [***]
>
> Even if the contamination was new or related back to 1985, Plaintiff had a duty under contract to notify Defendant within seven days of the Taylor Report. (Doc. 89, pgs. 18–19).

The record does not support these findings and they are very much in dispute. The boilerplate language in the DRF is not a specific instruction. In any

event, as explained above, the record establishes that L. Squared did not submit the DRF to report a new release; it did so because FDEP and its rules required it to do so.

L. Squared wholeheartedly disputes that it knew by March 8, 2018 — the date of the DRF — that gasoline and diesel were leaking from its facility. The record evidence establishes that between July 2017 and March 2018, L. Squared's investigation had revealed and its contractors had determined, that the noted contamination was from the pre-existing contamination and it should be remediated under the state-funded program. *E.g.*, (Doc. 57-8, pg. 8) ("The site is currently registered in the FDEP Petroleum Restoration Program and is awaiting funding for further assessment."); (Doc. 57-12, pg. 4) ("Taylor recommends addressing the groundwater contamination discovered at dispenser 5/6 as part of the EDI-funded assessment and cleanup."). It was not until April 2019 (as reflected in a June 2019 report) that L. Squared knew and confirmed that a new release had occurred, and FDEP still had doubts about a new release until much later. (Doc. 57-13). Furthermore, the Court's reliance on the Taylor Environmental Closure Report is misplaced. While it is true that Taylor found contaminated groundwater, it was unclear whether it was a result of the pre-existing contamination. (Doc. 57-12, pg. 4)

("It is our opinion that the contaminant concentrations in groundwater are from the original discharge reported in 1985 or from the discharge that was reported on March 8, 2018 . . . ."; "Taylor recommends addressing the groundwater contamination discovered at dispenser 5/6 as part of the EDI-funded assessment and cleanup.").

## CONCLUSION

For the foregoing reasons, Plaintiff-Appellant asks this Honorable Court to reverse the Final Judgment.

/s/ Dwight O. Slater
George W. Hatch, III, B.C.S. • FBN 0072028
george@guildaylaw.com
Robert D. Fingar, Esq. • FBN 0578282
bob@guildaylaw.com
Dwight O. Slater, B.C.S. • FBN 0030607
dwight@guildaylaw.com
Elizabeth M. van den Berg • FBN 0087744
elizabeth@guildaylaw.com
**GUILDAY LAW, P.A.**
1983 Centre Pointe Blvd., S-200
Tallahassee, Florida 32308
P: (850) 224-7091
F: (850) 222-2593

*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Appellant's Opening Brief complies with the type-volume limitation of Fed. R. App. P. 32. The number of words in Appellant's Opening Brief is 11,015.

/s/ [*Dwight O. Slater*]
Dwight O. Slater, B.C.S.
*Counsel for Plaintiff-Appellant*